CRT04256826
Cause#: 20246A 25
PROBATE OPPRP

DOCKET NO. 20246, A

| | | |
|---|---|---|
| *IN RE*: THE ESTATE OF MARQUIS R. POLIDORE, SR., DECEASED, Plaintiff; | § | IN THE COUNTY COURT-AT-LAW |
| | § | |
| vs. | § | OF FORT BEND COUNTY, T E X A S |
| | § | |
| TIMOTHY McBRIDE, Defendant. | § | COURT NUMBER TWO (2) |

**PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ESTATE OF MARQUIS R. POLIDORE, SR., by and through its Independent Executor, JOANNE POLIDORE, complaining of TIMOTHY McBRIDE, and would show the court as follows:

I. DISCOVERY CONTROL PLAN

Pursuant to TEX. R. CIV. P. 190.2, Plaintiff files this lawsuit under a Level 2 Discovery Control Plan.

II. PARTIES, JURISDICTION, AND VENUE

Plaintiff ESTATE OF MARQUIS R. POLIDORE, SR. is a Texas Estate of the late Marquis R. Polidore, Sr., MM1(SS), USN.

Defendant TIMOTHY McBRIDE is a resident of the State of New Jersey in which he may be served with process at 1351 Taft Road, Teaneck, NJ 07666-2828 pursuant to TEX. R. CIV. P. 106(a)(2) and 108.

The County Court at law has jurisdiction to hear all matters pertaining or incident to an estate pursuant to TEX. PROB. CODE § 5 under the "probate exception," *see Marshall v. Marshall* 126 S.Ct.

1735, 1748 (2006).

The Court has *in personam* jurisdiction over the defendant under the Texas Survival Statute, TEX. CIV. PRAC. & REM. CODE § 71.031.

Venue is proper in Fort Bend County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.088.

III. FACTS

1. The incident that gives rise to this lawsuit on January 7, 2007 are those described in RI Accident Report No. 07-RIK3-8-AC, a true and correct copy of which is attached hereto as Exhibit "A" and incorporated herein by reference as if set forth at length.

2. The defendant Timothy McBride's involvement in the incident is set forth in his witness statement in which he makes statements against interest. That statement is attached hereto as Exhibit "B" and incorporated herein by reference as if set forth at length.

IV. FIRST CAUSE OF ACTION: NEGLIGENT OPERATION OF A MOTOR VEHICLE: ORDINARY, GROSSLY NEGLECTFUL, AND *PER SE*

At time of trial, plaintiff will show that Timothy McBride operated his motor vehicle in question in a negligent and grossly neglectful manner and that that conduct was the proximate cause of the death of Marquis R. Polidore, Sr.

Plaintiff will further show that Timothy McBride operated his motor vehicle well in excess of the speed limits involved, that the decedent was among the class of persons sought to be protected by those laws, and that the negligence *per se* was one of the proximate causes of the wrongful death of the decedent.

As a direct and proximate result of the conduct involved, plaintiff estate seeks both ordinary and exemplary damages.

V. DAMAGES TO MARQUIS R. POLIDORE, SR.

Upon trial of the case, it will be shown that Marquis R. Polidore, Sr. Did not die instantly but that, at the roadside, he was able to briefly communicate with his wife in such a manner as to evidence knowledge of his imminent death, his own grief at the impending loss of his wife and children to him, his own knowledge of the effects his death would have on his wife and minor children, and his own intense physical suffering.

For these damages, the Estate seeks ordinary damages in the amount of $10 million dollars and exemplary damages in the amount of $20 million dollars.

VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, plaintiff requests that Timothy McBride be cited to appear and answer and that upon trial of the case the Estate have the damages it seeks herein based on the causes of action pled. The Estate also seeks such other and further relief, whether at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

DANIEL J. SHEA, P.C.

By: ____________________

DANIEL J. SHEA
State Bar No. 18163850
1928 West Bell St.
Houston, TX 77019-4814
(713) 942-7500
(713) 942-7507 Facsimile

ATTORNEYS FOR PLAINTIFF, ESTATE
OF MARQUIS R. POLIDORE, SR.

Vehicle # 1 was traveling south in the first lane of travel on Route 95 in the Town of Hopkinton. At that time a vehicle traveling south in the high speed lane, identified as a green Toyota Tacoma pick-up truck, bearing RI Commercial Registration 256658, made a lane change from the high speed lane partially into the first lane of travel. The operator of the Toyota then changed back into the high speed lane due to the approach and location of Vehicle # 1.

As the Toyota changed back into the first lane of travel, the operator of Vehicle # 1 swerved to the right and into the breakdown lane and began to lose control of the vehicle. The operator of Vehicle # 1 then swerved back into the first lane of travel and then back into the breakdown lane and onto the grass shoulder of the roadway. As Vehicle # 1 began to travel on the grass shoulder of the roadway, the rear of Vehicle # 1 began to rotate counter-clockwise. Vehicle # 1 then rolled over and the driver's side of Vehicle # 1 struck the grass shoulder. Vehicle # 1 then continued to rotate over and the front passenger side of the vehicle then struck the roadway in the first lane of travel. Vehicle # 1 then came to rest on its roof facing south in the first lane of travel.

During this rotation, one of the rear passengers, identified as MARQUIS POLIDORE, 3/16/79, was ejected from the vehicle and killed. MARQUIS POLIDORE's body then came to rest in the breakdown lane right along the edge of the grass shoulder of the roadway. All of the other adult occupants of Vehicle #1 were then assisted from the vehicle after it came to final rest. Troopers were unable to determine whether Marissa Polidore was ejected from the vehicle during the crash or if she was assisted from the vehicle after it came to final rest.

*** SEE SPHV INCIDENT REPORT # 07RIK3-15-OF***

*** SEE RECONSTRUCTION NARRATIVE FOR MEASUREMENTS***

EXHIBIT
"A"

Troopers Coleman and L'heureux from the State Police Collision Reconstruction Unit then examined the scene and took measurements of the crash. Troopers were able to determine the initial location where the vehicle exited the paved portion of the roadway and began to travel on the grass shoulder.

Troopers measured the distance of the passenger side rear tire furrow marks in the grass shoulder of the roadway from their initial location in the grass shoulder to their last visible location. This distance measured 113 feet and 2 inches in a southern direction.

Troopers measured the distance of the passenger side front tire furrow marks in the grass shoulder of the roadway from their initial location in the grass shoulder to their last visible location. This distance measured 72 feet and 11 inches in a southern direction. The last 4 feet and 8 inches of this mark left a gouge along the edge of the paved portion of the breakdown lane with its border with the grass shoulder, moving in a southeast direction back towards the lane of travel.

Troopers then measured the distance from the last visible furrow marks from the passenger side of the vehicle in the grass shoulder to the deep impact points of the driver's side of the vehicle in the grass shoulder. The nearest gouge measured 19 feet and 10 inches and the second gouge measured 8 feet and 11 inches south of the first gouge, both traveling in a southern direction.

Troopers then measured the distance from the southern most gouge on the shoulder to the first visible impact gouge in the breakdown lane. This distance measured 18 feet and 10 inches. This impact point was determined to be from the front passenger side of the vehicle due to the glass lens debris embedded into the asphalt in this gouge.

Troopers then measured the distance from the above impact gouge to the next visible gouge also located in the breakdown lane. This distance measured 39 feet and 2 inches.

Troopers then observed several more gouges and scrapes along the roadway leading towards the final rest position of the vehicle. The distance from the above impact gouge to the area where the major scrapes and gouges began was approximately 29 feet and 8 inches. This impact area was determined to be from the roof of the vehicle as it began to slide towards its final rest.

Troopers then measured the total distance from the beginning of the initial furrow mark to the rear of the final rest position of the vehicle. This distance was approximately 294 feet.

Troopers then measured the total distance from the beginning of the initial furrow mark to the location of the body of the deceased. This distance was approximately 228 feet.

Troopers then measured the total distance from the location of the the body of the deceased to the rear of the final rest position of the vehicle. This distance was approximately 69 feet.

Troopers then marked the final rest position of the vehicle which came to rest on its roof facing south in the first lane of travel.

Due to the above examination of the scene and of the vehicle, Troopers were able to determine the location of the vehicle as it left the paved portion of the roadway and its location and position as the vehicle rolled over

# Witness Statement

CASE # 07RIK3-15-OF

TIME: 4:00 PM

DATE: 01/07/2007

PLACE: State Police Hope Valley Barracks

I, Timothy M. McBride, voluntarily without threats or promises, make the following statements:

Q. What is your name?

**A. Timothy McBride**

Q. What is your date of birth?

A. [redacted]

**Q. What is your present address?**

**A. 1351 Taft Road, Teaneck, NJ**

**Q. What is your occupation?**

**A. Manager**

**Q. What is your phone number?**

**A. My home number is 201-837-4231**

Q. You are here today to give a statement in regards to an accident that occurred today on Route 95South in the Town of Hopkinton. Is this Correct?
A. Yes

Q. Where were you going today?
A. I was returning to my home in New Jersey.

Q. Where were you coming from?
A. I was coming from Rehoboth, MA

Q. Before observed the accident, approximately, how fast were you going?
A. Approximately 80 MPH.

Q. What vehicles were ahead of you?
A. Directly in front of me was a pick up truck in the high speed lane and a black Volkswagen in the low speed lane. I was intending on passing both vehicles.

Q. What lane were you in?

EXHIBIT
"B"

A. I was in the high speed lane.

Q. How far back from the pickup truck were you?
A. About two car lengths maybe more.

Q. Approximately how fast was the pickup truck traveling?
A. Maybe 75 MPH, I don't know, but I am going to guess at 75MPH.

Q. Approximately how fast was the black vehicle traveling?
A. Maybe 78 MPH because the black car and myself were both gaining on the pickup truck.

Q. What were the road conditions like?
A. Dry and well lit. However, the sun was coming in, we all had our sun visors down.

Q. What were the traffic conditions like?
A. Overall, I would say moderate. I don't remember what was in front of us and I don't remember what was immediately behind us.

Q. What happened next?
A. It appeared that the truck driver was going to clear the lane for me by pulling into the slow lane. He put his blinker on and after approximately 3 flashes, he slowly moved to his right and at that point he corrected and moved back to the high speed lane. After a fraction of a second after the truck corrected, the black Volkswagen began to veer to the right and left the slow lane. He began to arch back to the left back into the slow speed lane. I was not yet in front of him at that time and he began to correct again to the right, so as not to come back into my path. I then saw the black car begin to roll. the front of the vehicle was to the right and the rear of the car was facing me. I then accelerated to pass. The truck had apparently accelerated to clear the lane for me and then we both pulled over to the shoulder. My wife dialed 911 and I told her we were south of Rt. 138 and I began to run back the black vehicle. When I arrived at the vehicle, It was at rest on its roof. Other people had stopped and I saw them pulling open doors and then walked away. As I passed the vehicle, it appeared to be unoccupied. Other people had gathered the scene were the injured were. I could see a man checking for a pulse and I could hear a woman screaming and crying. I thought it might be better if I put myself into traffic so people would keep moving and not rubberneck. Another man joined me in that effort. I could see many people were calling for help.

Q. Did it appear that the operator of the pickup truck was operating erratic directly before the accident?
A. No, not at all.

Q. Did it appear that the operator of the black Volkswagen was operating erratic directly before the accident.?
A. I would say no, until he lost control.

Q. Did you see any of the occupants eject from the vehicle while the vehicle was rolling?
A. No, I did not.

Q. Do you think the accident was caused by an error in judgement by the operator of the pickup

truck?
A. No, No I do not.

Q. Do you think the accident was caused by an error in judgement by the operator of the black volkswagen?
A. Possibly. If everyone was traveling at a lower rate of speed, everyone's judgement would look a whole lot better.

Q. Did you happen to see the either vehicle prior to accident?
A. No

Q. Did you see who was occupants of the black volkswagen?
A. No, I was not aware of the occupants of either vehicle, I only noticed the actions of the vehicles.

Q. Do you have anything else you wish to add to this statement?
A. No, I do not.

Is the above statement true to the best of your knowledge? ____________________
Yes, it is true.

____________________________

Statement taken by:

Witness:

(office use only: 1-99)

FILED
07 JUN -7 PM 1:19
COUNTY CLERK
FORT BEND COUNTY, TEXAS

STATE OF TEXAS
COUNTY OF FORT BEND
I, Dianne Wilson, Ph.D., County Clerk of Fort Bend County,Texas, do hereby certify that the foregoing is a true and correct copy as the same appears on file and recorded in the appropriate records.
Note: A portion of a personal identifying number may have been redacted as allowed by law.
JUL - 6 2007 Date
Dianne Wilson, Ph.D., County Clerk
Fort Bend County, Texas