UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


JOANNE G. POLIDORE, as Independent
Executor of the
ESTATE OF MARQUIS R. POLIDORE, SR., et al,
        Plaintiffs,

    v.                           C.A. No. 07-433ML

TIMOTHY McBRIDE and LYDON OVEN COMPANY
        Defendants.

**consolidated with**

JENNIFER G. STEVENS

    v.                           C.A. No. 09-81ML

TIMOTHY McBRIDE, LYDON OVEN COMPANY,
and ZACHARY PLACE


<u>MEMORANDUM AND ORDER</u>


This case of alleged negligence resulting in the death of a young father and permanent injury to his infant daughter is before the Court on the motion for summary judgment by two of the defendants, Timothy McBride ("McBride") and Lydon Oven Company ("Lydon"). Because a resolution of the defendants' motion involves a determination of defendants' contemporaneous motion to exclude testimony by plaintiffs' accident reconstruction expert, Donald L.

1

Mong ("Mong"), the Court will address that motion as well.[1]  For the reasons that follow, the defendants' motion for summary judgment by McBride and Lydon is DENIED; and the defendants' motion to exclude Mong's testimony is GRANTED.

I.  Factual Background

In the early afternoon of January 7, 2007, Jennifer Stevens ("Jennifer") was driving her black 1997 Volkswagen Jetta on Route 95 South.  Jennifer was returning to Groton, Connecticut, after picking up her sister, Joanne Polidore ("Joanne"), her brother-in-law, Marquis R. Polidore, Sr. ("Marquis") who was then an instructor at the U.S. Navy Submarine School, and their 18-month old daughter, M. ("M.") from T.F. Greene airport in Warwick, Rhode Island.  Jennifer's other sister, Joy Estoque, was seated in the front passenger seat.  Marquis was seated in the back of the car on the driver's side, his wife Joanne was seated in the back on the passenger side, and their daughter M. was seated in her car seat in the middle back seat.

At first, Jennifer was traveling primarily in the left passing lane of the 4-lane divided highway at a speed of approximately 70

---

[1]

Although the plaintiffs note that their recitation of facts is made without reference to Mong's report, the defendants argue in their motion for summary judgment that "Mong has offered no competent testimony which would be admissible in this case at the time of trial and thus his opinion can in no way support the plaintiff's opposition to this motion."  Defs.' Mem. at 11.

miles per hour.[2]   The weather was sunny; traffic was light; and the radio was playing loudly.   After passing Exit 2, Jennifer moved into the right lane.   Shortly thereafter, Jennifer was alerted by her sister Joy to "watch out" for a pick-up truck that attempted to pass the Jetta and move into the right lane.   According to Jennifer, by the time she became aware of the pick-up truck, a portion of the truck was already in front of the Jetta, while the bed of the truck was right next to the Jetta.   In order to avoid a collision, Jennifer beeped the horn and turned the steering wheel hard to the right, causing the Jetta to enter the breakdown lane. Jennifer then turned the steering wheel sharply to the left to return to the right driving lane, a maneuver which caused the Jetta to roll over several times.

According to Zachary Place ("Place"), the driver of the pick-up truck, Place noticed a car coming up behind him shortly before the accident.   As the car was closing the distance to Place's pick-up truck to about two car lengths, Place was "under the understanding that he [McBride] wanted to pass me" and "therefore, I was moving out of his way."   Place was in the process of moving into the right lane when his passenger, Joshua Sullivan ("Sullivan") alerted him that the truck was getting close to a

---

[2]

It is undisputed that the speed limit on that section of I 95 is 65 mph.

black Jetta in that lane.  In response, Place started to move back into the left lane.  At that moment, Stevens' black Jetta veered quickly into the breakdown lane, then back onto the highway. Place, who observed in his passenger side mirror that the Jetta had begun to flip over, pulled into the breakdown lane and called 911.

Sullivan's account is that Place started to move into the right lane after putting on his right turn signal, when Sullivan, out of the corner of his eye, saw the Jetta coming up on the right side of the truck.  Sullivan yelled at Place that there was a car on the truck's ride side, after which Place steered the truck back into the left lane.  Sullivan noticed the Jetta veer to the right into the breakdown lane, swerve to the left, flip over, and come to rest on the roof of the car.

According to McBride, just prior to the accident, he was driving a minivan approximately two car lengths behind Place's pick-up truck in the left lane.  McBride's wife Suzanne was a passenger in the minivan.  McBride intended to pass both the pick-up truck and the Jetta, which was ahead of McBride, but in the right lane.  McBride estimates his speed at that time at approximately 80 mph, the speed of the pick-up truck at 75 mph, and the speed of the Jetta at approximately 78 mph,[3] noting that both

---

[3]
It appears that McBride's estimate of 78 mph is based on the fact that the Jetta, although moving slower than the minivan, was

the Jetta and McBride's car were gaining on the pick-up truck.

According to McBride, it appeared that the pick-up truck was going to clear the left lane for him by pulling into the right lane. McBride confirms that Place used his turn signal and moved slowly into the right lane but then corrected and moved back into the left lane. At the same time, McBride observed the Jetta veer to the right and leave the right highway lane, after which it began to arch left back into the right lane. When McBride saw the Jetta begin to roll, he accelerated to pass and pulled over to the shoulder near Place's truck, where McBride's wife Suzanne also called 911.

As a result of the rollover, Marquis was ejected from the Jetta and died at the scene of the accident. M. was ejected from the Jetta as well and suffered severe injuries.[4] Jennifer, Joanne, and Joy were transported to the Westerly Hospital, but were apparently not significantly injured. As conceded by Joanne, neither she nor Marquis had been wearing their seatbelts. M.'s car seat was found belted in the middle back seat, but was obviously loose; the harness clips were open and undone; and the harness

---

gaining on the pick-up truck.

[4]
It was initially unclear whether M. was ejected from the car as well or whether she was removed by someone after the accident. The Third Amended Complaint alleges that M. was ejected from the car.

buckle was not buckled into the car seat buckle. The top of the car seat sustained some damage, possibly by hitting the roof during the rollover. Although attending state troopers were unable to conclude whether M. had been strapped into her seat, they determined that the car seat had not been properly installed. M. was transported to Hasbro Children's Hospital with critical injuries. She has since been diagnosed with a traumatic brain injury that will require lifelong medical attention.

II.   Procedural Posture

On June 7, 2007, a complaint on behalf of the estate of Marquis Polidore against McBride was filed in Texas state court based on the decedent's residency in Texas. McBride, a New Jersey resident, removed the case to the United States District Court for the Southern District of Texas, based on diversity between the parties. On November 24, 2007, the district court determined that it lacked personal jurisdiction over McBride or his business Lydon Oven Company, a Delaware corporation that owned the car McBride was driving on the day of the accident. Accordingly, the case was transferred to this Court pursuant to 28 U.S.C. § 1406(a).

The Second Amended Complaint[5] filed on November 29, 2007,

---

[5]

A Third Amended Complaint was filed on August 23, 2010, acknowledging the applicability of Rhode Island law and omitting the parents of the decedent as plaintiffs because Rhode Island law does not support their claim for loss of consortium.

alleges that McBride operated his car "well in excess of the speed limits and distance between vehicles statutory restrictions imposed by the State of Rhode Island," Second Amended Complaint ¶ 4, and that "the negligence *per se* was one of the proximate causes" of the injury to M. and the death of Marquis. <u>Id.</u> The complaint also asserts vicarious liability of Lydon for McBride's alleged negligence.

On November 25, 2009, Jennifer Stevens, a Connecticut resident, filed a complaint in Rhode Island state court asserting negligence against McBride, Lydon, and Place. McBride and Lydon removed the case to this Court where it was consolidated with the complaint filed on behalf of Marquis Polidore's estate.

On April 19, 2010, McBride and Lydon filed a motion for summary judgment on the ground that "there is no competent evidence that the operation of the McBride vehicle was in any respect the proximate cause of the accident." Memorandum in Support of McBride and Lydon's Motion for Summary Judgment 10. Specifically, McBride and Lydon assert that "not one witness has testified that McBride was a contributing cause to the accident." <u>Id.</u> at 5. The defendants also suggest that the plaintiffs' expert witness on accident reconstruction, Donald L. Mong, fails to support plaintiffs' assertions with competent and admissible testimony. To establish their position, the defendants filed a contemporaneous

motion to exclude Mong's testimony.   With respect to the claims against Lydon, the defendants assert that (1) Rhode Island does not recognize a claim of negligent entrustment;[6] and (2) on the day of the accident, McBride was not traveling while in the scope of his employment with Lydon.

Plaintiff Joanne Polidore, individually and as executrix of her late husband's estate, filed an objection on May 6, 2010, asserting that "the illegal and aggressive driving" of McBride was the "proximate cause" resulting in the rollover of the Jetta and the death and injuries described in the complaint.   Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment 2. Specifically, Joanne Polidore asserts that McBride's "own admissions concerning excessive speed and tailgating constitute a solid basis upon which a jury could find that his illegal conduct was the proximate cause of the chain of events and the rollover of the [Jetta]."   Id. at 6 n. 4.   With respect to the defendants' motion to exclude the testimony of Mong, the plaintiffs maintain that such a determination is premature and that the defendants' objections against Mong's testimony go to weight, not admissibility.

On July 2, 2010, all claims by Stevens against Place and all

---

[6]

The claim of negligent entrustment is no longer being asserted in the Third Amended Complaint.

8

cross-claims by and between the three defendants were dismissed by stipulation.

III.   Summary Judgment Standard

A motion for summary judgment is governed by Federal Rule of Civil Procedure 56 and should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A "material fact" is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The burden to show the absence of a genuine issue of material fact rests on the party moving for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must demonstrate that, "with respect to each issue on which she would bear the burden of proof at trial, . . . a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).

The Court, when "passing upon a motion for summary judgment, ... must take the facts in the light most favorable to the

nonmoving party, drawing all reasonable inferences therefrom to that party's behoof." Puerto Rico American Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 130 (1st Cir. 2010). In this assessment, the Court may ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

IV. Analysis

A. The Traffic Accident Reconstructionist

Plaintiffs have designated Donald Mong as their expert witness with respect to the events surrounding the accident. Mong is a retired Patrol Officer who now works as a private investigator and also offers his services as an expert witness with respect to traffic accidents. Mong holds an associate degree in Administration of Justice and has, by his own testimony, attended hundreds of motor vehicle accidents as a police officer.

On September 8, 2009, Mong submitted a "Traffic Accident Reconstruction Report Collision Analysis" ("Mong's Report"). Based solely on materials submitted to him by plaintiffs' counsel, Mong arrived at the following conclusions:

> The McBride vehicle came up behind the Place vehicle in an attempt to overtake the Place vehicle. Had this pre-impact event not have occurred, then the Place vehicle would not needed [sic] to change lanes, therefore the encroachment into the path of the Volkswagen would not have occurred. The initial approach of the McBride vehicle at a high rate of speed was the initial event that caused the others to occur. Had the McBride vehicle

not started the sequence, this crash would have been avoided.

Mong's conclusions are based on a review of the state police traffic report, post-accident photographs of the vehicles, state police interviews with some of the witnesses, and a "visit" to the scene of the accident at an unspecified date. The defendants assert that "Mong's reconstruction lacks any scientific analysis that could aid the trier of fact with any issue in this case and amounts to pure personal opinions, observations that do not meet the reliability requirements of <u>Daubert</u>." Defendants' Mem. 13. The plaintiffs respond that defendants' motion is premature and that the "true value of Mong's participation . . . is found in the background testimony that Mong will supply in support of his expert opinion." Plaintiffs' Mem. 13.

The testimony of expert witnesses is governed by Federal Rule 702. Rule 702 provides, in pertinent part, that a qualified expert witness may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In addition, an expert's testimony must be "based upon sufficient facts or data," "the product of reliable principles and methods," and the expert must "appl[y] the principles and methods reliably to the facts of the case." <u>Id.</u>

The Court performs a gatekeeping function to determine whether expert testimony is helpful to the trier of fact, *i.e.*, whether it is reliable and relevant to the facts of the case. Bogosian v. Mercedez-Benz of North America, Inc., 104 F.3d 472, 476 (1st Cir. 1997). In order to be admitted, expert testimony must be relevant "in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998). In making such a determination, the Court has substantial discretion in deciding whether opinion evidence should be admitted or excluded. Crowe v. Marchand, 506 F.3d 13, 16 (1st Cir. 2007)(Court has "substantial latitude in the admission or exclusion of opinion evidence").

Generally, the Court will ascertain the admissibility of expert opinion by looking to the principles set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Daubert requires the court to determine "'whether the reasoning or methodology underlying [proffered expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'" Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d 184, 188 (1st Cir. 1997)(quoting Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796). The Court's gatekeeping function "applies to technical

and other specialized knowledge in addition to scientific testimony." Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002)(citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

The First Circuit has further determined that "[t]he *Daubert* regime can play a role during the summary judgment phase of civil litigation." Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d at 188. Accordingly, when proffered expert testimony is deemed inadmissable under Daubert, the Court "may exclude that evidence from consideration when passing upon a motion for summary judgment." Id. (listing cases). The First Circuit noted that, "[a] trial setting normally will provide the best operating environment for the triage which *Daubert* demands" and that *voire dire*, which is not available at summary judgment, "is an extremely helpful device in evaluating proffered expert testimony." Id. Therefore, courts are instructed to be cautious "not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." Id. However, an exception may be made "when defects are obvious on the face of a proffer." Id.

Based on a thorough review of Mong's Report and the transcripts of Mong's depositions on February 4, 2010 and April 13,

2010, this Court is of the opinion that the defendants' objections to Mong's testimony are well taken and that an exclusion of Mong's testimony is appropriate in this case. The Court notes that Mong was given every opportunity at two separate depositions to explain his methodology and analysis or to provide a basis for the conclusions set forth in his report.

According to Mong's testimony given during the depositions, his "Traffic Accident Reconstruction Report Collision Analysis" is based exclusively on a review of materials provided to him by counsel for Joanne Polidore. Deposition Transcript February 4, 2010 (TR I), 28:1-4, 28:24 - 29:3, 63:13-15. Mong's review was limited to (1) photographs showing damage to the Jetta, (2) an incident report prepared by the Rhode Island State Police, and (3) several witness statements supplied by counsel.[7] Mong concedes that he did not review two CDs provided him together with the photographs, and that his "visit" to the accident scene consisted of stopping briefly in the general vicinity of the accident without getting out of his car or undertaking any measurements.  TR I, 94:11-96:18.

Moreover, Mong's responses to questions posed to him at his depositions  reveal that he did not conduct his own investigation or analysis of the accident.  TR I, 28: 13-16.  By his own account,

---

[7]

Following his first deposition, Mong also reviewed the deposition testimony of Joanne Polidore and McBride, but issued no supplement to his initial report.

Mong never spoke with any member of the Rhode Island State Police on the accident. TR I, 40:8-41:13, Deposition Transcript April 13, 2010 (TR II), 133: 21-25.  Although Mong suggested that sun glare may have contributed to the accident and he was critical of the State Police because they failed to investigate this possibility, Mong conceded that he did not conduct such an investigation himself.   TR I, 40:8-41:13.   According to Mong, it was not necessary for him to make an independent assessment of the glare issue in order to perform a proper accident report. TR I, 41:25-42:3.   Mong also did not conduct a time and distance analysis, although he was critical of State Police not to have done such an analysis. TR I, 47:10-22, 61:3-18.  Mong explained that he was not asked to perform such an analysis and that, in any case, such analysis would not have informed his opinions or conclusions in this case.  TR I, 59: 8-19.

Instead, Mong merely reviewed the materials provided to him by plaintiffs' counsel and based his conclusions entirely on his interpretation of the facts and statements contained in those materials. Mong did not take any measurements or photographs for his assignment in the case.  He did not physically survey the scene of the accident, interview any of the witnesses or any member of law enforcement that were at the scene, or examine any of the vehicles involved in the accident. TR II, 167:2-15.   With respect

to the cause of the accident, Mong was unable to explain what methodology he employed or how his education, training or experience enabled him to arrive at his conclusions.

In sum, Mong's stated conclusions and opinions are not the result of any particular scientific methodology, nor are they based on any unique knowledge or expertise. Instead, Mong merely reviewed the police report and other materials and "basically came up with [his] findings." TR II, 148:10-14. As such, Mong's conclusions and opinions lack the reliability required by Daubert and would provide no assistance to a reasonable jury in assessing the presented evidence, as required by Rule 702.

B. McBride's Role in the Accident

The defendants assert that, after the parties conducted extensive discovery, "not one witness has testified that McBride was a contributing cause to the accident," Defs.' Mem. 5, and that "[n]ot one participant or witness . . . has been critical with respect to McBride's operation of his motor vehicle at the time of the accident." Id. at 6. They also maintain that "it is mere conjecture that McBride's operation of his vehicle was a proximate cause of the accident." Id. at 11.

McBride, by his own estimate, admitted that he was driving approximately 80 mph - 15 miles above the speed limit - and that he was only about two car lengths behind Place's pick-up truck just

16

prior to the accident.  McBride also estimated that the pick-up truck was traveling at 75 mph, since he was "gaining on" it. Further, McBride stated that he intended to pass the pick-up truck and that the pick-up truck attempted to pull into the slow lane in order to "clear the lane" for McBride.  McBride's wife added that "we try to pace vehicles when we drive and we were pacing a Volvo and then these vehicles came between us and we lost sight of the Volvo." She also estimated the distance between McBride's car and the pick-up truck to be "maybe two car lengths."

A review of the parties' submissions and the various statements by parties and witnesses reveals that Place "was under the impression" that McBride wanted to pass him.  Place confirmed that his reason for moving into the right lane was to move out of McBride's way after he realized that McBride's car was gaining on the pick-up truck.  At the time Place began signaling and turning into the right lane, he estimated the distance between McBride's car and the pick-up truck to be "[p]ossibly a car length." Place acknowledged, however, that "he was not startled in any way by the McBride vehicle approaching him from behind."

Plaintiffs suggest that McBride may have flashed his lights while coming up to the pick-up truck in order to convey that he wanted to pass. This suggestion is based on a comment Place allegedly made to a process server in this litigation, which Place

himself no longer appeared to remember at his deposition.  On their part, the defendants point out that Place has consistently stated that he was not "startled or alarmed" by McBride's approach of the pick-up truck and that he slowly moved into the right lane after first signaling his intent to do so.

Based on the evidence submitted to this Court, even in the absence of any conclusions presented by plaintiffs' accident reconstruction expert, there clearly is a significant dispute regarding the precise order of events, and particularly, the impact of McBride's driving on the tragic events that followed.  The defendants assert that, since there was no contact between McBride's car and any of the other cars involved in the accident, "combined with the lack of any testimony implicating the McBride vehicle," summary judgment must be granted for McBride.  It is undisputed, however, that McBride was traveling 15 miles in excess of the maximum allowable speed and that he was closing the distance with the pick-up truck he intended to pass to two car lengths or less, causing the driver of the pick-up truck to "clear the lane" for him.  Whether such conduct by McBride can be said to constitute a contributing cause of the accident is a determination for the trier of fact and cannot be determined at summary judgment. Accordingly, the motion for summary judgment with respect to McBride is denied.

18

C. Lydon's Potential Liability

Although the third amended complaint no longer asserts negligent entrustment against Lydon as McBride's employer, it alleges vicarious liability of Lydon pursuant to R.I. Gen. Laws § 31-33-6. The statute provides that "[w]henever any motor vehicle shall be used, operated, or caused to operated upon any public highway of this state with the consent of the owner . . ., expressed or implied, the driver of it, if other than such owner . . . shall in the case of accident be deemed the agent of the owner . . . of the motor vehicle." R.I. Gen. Laws § 31-33-6. The term "owner" includes any "person, firm . . . or corporation having the lawful possession or control of a motor vehicle under a written sale agreement." Id.

Section 31-33-6 imposes liability on the owner of a motor vehicle for the acts of a driver "irrespective of whether the acts are committed within or outside" of an agency relationship between the driver and the owner. Ostrosky v. Sczapa, 739 F. Supp. 715, 717 (D.R.I. 1990) (statute abrogates common law rule shielding "automobile owner from liability for negligence of a person to whom the vehicle was entrusted unless such negligence occurred while the operator was engaged in the owner's business").

In order to prevail in their claim against Lydon, plaintiffs must prove that (1) McBride was negligent; (2) McBride was

19

operating the car in question on a public highway; (3) the car was owned by Lydon; and (4) the car was driven with Lydon's consent. Martin v. Lilly, 505 A.2d 1156, 1160-61 (R.I. 1986). Under Section 31-33-6, whether or not McBride was traveling in the scope of his employment is irrelevant to the plaintiffs' claims against Lydon.

In this case, it is undisputed that McBride was driving on a public highway on the day of the accident and that his car was owned by, and registered to, Lydon. McBride is also the president of Lydon. Under those circumstances, and absent any assertion that consent was lacking, the fact that McBride's car was registered to Lydon may well indicate that it was being operated with Lydon's consent. However, any liability of Lydon depends on whether McBride was negligent in operating the car owned by Lydon. Having determined that McBride's alleged negligence cannot be resolved at the summary judgment stage, a determination of Lydon's liability is likewise premature. Therefore, the defendants' motion for summary judgment with respect to Lydon is denied.

**Conclusion**

For the reasons stated herein, the motion for summary judgment by defendants Timothy McBride and Lydon Oven Company is DENIED. The motion by these defendants to exclude expert testimony by plaintiffs' expert Donald L. Mong is GRANTED.

SO ORDERED.

Mary M. Lisi
Chief United States District Judge

September 10 , 2010